## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STEVEN BLACKSTONE,** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | CIVIL NO. PJM-04-1180 |
| | * | |
| **ASBURY-SOLOMON'S ISLAND**, | * | |
| | * | |
| Defendant | * | |

## <u>OPINION</u>

### I.

Steven Blackstone, pro se,[1] has sued Asbury-Solomon's Island ("ASI"), claiming discriminatory treatment based on race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, *et seq.,* ("Title VII") and 42 U.S.C. §1981 ("Section 1981") (Count 1); wrongful discharge in violation of Title VII and Section 1981 (Count 2); malicious prosecution (Count 3); defamation (Count 4); and tortious interference with prospective advantage (Count 5). ASI has filed a Motion for Summary Judgment, which Blackstone opposes. The Court will GRANT the Motion.

---

[1] Though previously represented, Blackstone is now proceeding *pro se.*

1

## II.

ASI is a not-for-profit continuing-care retirement community located in Solomon's Island, Calvert County, Maryland. It provides residential living, assisted living, and skilled nursing care to elderly residents. Nursing care, which includes rehabilitative and long-term care to residents with specialized healthcare needs, is provided in ASI's Health Care Center. The Health Care Center is licensed by the State of Maryland and is a certified Medicare provider.

Steven Blackstone was hired in November of 2001 as a Certified Medicine Aide (CMA) and assigned to the Health Care Center. As a CMA, Blackstone was charged with ordering and distributing medicines to elderly patients as well as keeping the medication cart clean.

On February 22, 2003, a resident at the Center told Pat Smawley, the Charge Nurse, that a male employee had "sexed her anus." A few days later, Smawley reported the allegation to Samantha Murray, Director of Nursing, who initiated an investigation in conformity with ASI's Policy on Abuse/Neglect of Residents. Initial indications pointed to Blackstone as the perpetrator and he was placed on suspension pending investigation. Nursing Director Murray and Lisa Caudle, a social worker, then conducted a documented interview of the 94 year-old resident, who repeated the sodomy allegations. Since Blackstone was the only male medicine aide who had provided care to the resident, and because the resident's description matched him, they concluded that the resident was complaining of him.

At the end of February, pursuant to Maryland law and the ASI Resident Abuse Policy, Murray reported these allegations and the results of ASI's investigation to the Calvert County Office on Aging, the

Office of Health Care Quality[2], and the Calvert County Sheriff's Office. The Calvert County Sheriff's Office then sent Detective Hollinger to ASI to investigate. When Hollinger arrived, Murray advised him that the resident making the abuse allegation suffered from dementia affecting her memory as well as macular degeneration, a condition that causes loss of vision. Murray also told Hollinger that Blackstone had administered suppositories to the resident during the time in which the assault was claimed to have occurred. Hollinger interviewed Blackstone, who denied any wrongdoing, but the resident refused to speak to Hollinger, stating she wanted to forget the incident . Based on these facts, both Hollinger and ASI found the allegations unsubstantiated and closed the case. Shortly thereafter Blackstone was permitted to return to work. Murray contacted the state and local agencies to tell them the results of the investigation.

A few months later, on June 4, 2003, another  resident in ASI's Assisted Living Facility told Assisted Living Coordinator Shelley Tilley that Blackstone made her anxious. When Tilley inquired as to the reason, the resident stated that a year earlier, while she was a resident in the Health Care Center, Blackstone had reached into her blouse and attempted to touch her breast. The resident stated that she had reported the incident to Bobbie Catterton, a former employee of ASI, but that she had asked Catterton to keep the information confidential. The next morning Tilley reported these allegations to Murray.

Murray initiated an investigation into this second incident. She also advised ASI Acting Administrator Frank Krohnert of the allegations. On June 5, Murray and Caudle conducted a documented interview of the resident, who reaffirmed her allegations and who stated moreover that her sister had witnessed the incident.  The resident then gave Murray and Caudle permission to interview her sister. Caudle interviewed

---

[2] The Office of Health Care Quality is the state agency responsible for claims of patient abuse.

3

the sister and asked if she recalled an incident between the resident and Blackstone about a year ago that was inappropriate. The sister confirmed the resident's story. Caudle also interviewed other employees who worked with Blackstone and who provided care to the resident making the allegations. Though ASI did not interview Catterton (who now claims to never have been told of the incident), a current staff member, Amy Thayer, reported that the complaining resident had told her of the incident a year earlier, and that Thayer had reported it to her supervisor but did not know what happened after that.

On the afternoon of June 5, Krohnert reported the second incident to the Calvert County Sheriff's Office. Detective Hollinger returned to ASI and interviewed the resident, the resident's sister and Blackstone. Blackstone denied these new allegations, stating that the resident and her sister never liked him and, though he did not know why, he suspected it was because he is African American. While Hollinger attests that Blackstone never cited any reason for suspecting that the resident made the allegations against him because of his race, Blackstone claims he told Hollinger that one of the resident's favorite words was "nigger."

The same day Hollinger interviewed Blackstone, Krista DiGeorge, ASI's Director of Human Resources, and Krohnert also interviewed him. During the interview, Blackstone told them he did not take the resident's allegations against him seriously and could not believe that they were doing so. Blackstone also stated  that he was a good-looking married man who had no reason to assault an elderly woman in that manner,  that he enjoyed his job and the fitness center at ASI, and that he had not missed a day of work. Blackstone stated that he was shocked that ASI would handle the investigation "in such a way that they would think [he] was guilty," which he inferred from the "here we go again"comment made by Krohnert during the interview. For his part, Krohnert contends that at no point during the interview did Blackstone

4

ever claim that the resident had fabricated the incident because of his race. Krohnert et al found both the resident and her sister to be lucid and that neither suffered from any medical condition that would affect their ability to observe or recall. In consequence, Murray, Krohnert, ASI Vice President Ron Waack, and ASI Executive Director Sue DaCamara decided to terminate Blackstone's employment. ASI contends that its decision had nothing to do with Blackstone's race. Waack, one of the individuals who voted to terminate Blackstone, affirms he did not even know Blackstone's race when he made his decision. After Blackstone was terminated, ASI hired Belinda Edwards, an African American woman, to replace him.

Murray reported the second resident's complaint and ASI's investigation of it to the Office of Health Care Quality and the Calvert County Office on Aging. On June 11,  Murray also forwarded a complaint form describing the resident's allegations to the Maryland Board of Nursing.

In a matter of days, Blackstone filed a charge of discrimination with the Maryland Commission on Human Relations (MCHR) and the EEOC. On July 3, the MCHR sent ASI a letter notifying it of the charge and asking it either to respond in writing to each allegation or to resolve the complaint through mediation. ASI did not immediately respond.

On July 7, Detective Hollinger submitted an application for statement of charges against Blackstone for second degree assault to the Commissioner's Office of the District Court for Calvert County. Approximately six weeks later, however, the state prosecutor entered a nolle prosequi on the assault charge and some three months after that the District Court for Calvert County expunged Blackstone's record. On April 7, 2004, the Maryland Board of Nursing informed Plaintiff that it had voted not to revoke his license.

Blackstone claims that because ASI reported the allegations to the various state and local agencies, he has been unable to secure nursing home employment since that time. In contrast, during discovery in the

present case, ASI uncovered documentation indicating that on two prior occasions at another nursing home Blackstone was accused of inappropriate touching of patients and that he apparently did not contest those allegations, resigning and then not calling or appearing for work before the effective date of his resignation. In addition, ASI discovered documents tending to show that Blackstone had either resigned or was terminated from positions at other nursing centers in the area.

### III.

Summary judgment is appropriate if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When a moving party supports his or her motion with affidavits and other appropriate materials, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the . . . response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A mere scintilla of evidence supporting the case is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is mandated where, after adequate time for discovery, a party fails to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

# IV.

## Disparate Treatment

Blackstone's claim of disparate treatment is based upon his belief that because of his race and color, ASI did not "thoroughly" and "impartially" investigate the allegations against him, and that other "similarly situated caucasian/white employees were treated more favorably during the investigative process and in the administration of discipline based on their race/color."

An employee may establish disparate treatment in the disciplinary process by demonstrating that the employer deviated from its standard procedure. *See Trammell v. Baltimore Gas & Electric*, 279 F. Supp.2d 646, 657 (D.Md. 2003). The employee may establish a prima facie case of racial or color animus by showing that (1) he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *Cook v. CSX Transp. Corp*., 988 F.2d 507, 511 (4th Cir. 1993).

Blackstone has satisfied none of these elements. He has not shown that ASI deviated from the "Procedure for Handling Suspected Abuse of Residents" section of its Policy on Abuse/Neglect of Residents nor has he shown that similarly situated individuals outside his protected class were treated more favorably than he.

ASI's investigation of the allegations against him was consistent with its Policy on Abuse/Neglect of Residents. At the beginning of the investigation, Nursing Director Murray reviewed the procedures for investigating allegations of resident abuse. Repeatedly throughout the process, she conferred with ASI Acting Administrator Krohnert to make sure she was following that protocol. ASI conducted

documented interviews with the alleged victim, the alleged victim's sister, witnesses who worked with both Blackstone and the alleged victim, and with Blackstone himself. ASI also reviewed the medical records of both the alleged victim and her sister to determine the extent to which their mental and physical conditions might have affected their ability to observe and recall. While it is true that former ASI employee Catterton was not contacted during the investigation and that she now denies that the resident told her of the incident a year prior, another employee, Amy Thayer, reported that the resident had in fact made the allegation to her a year earlier.

When asked on deposition why he thought ASI's investigation was incomplete and biased, Blackstone could only surmise that "they could have somehow just looked at [him] in a different light," and that the investigation was conducted in a way that made him believe they thought "all black people were alike and that the allegations didn't really merit a thorough investigation or even an impartial investigation." This impression was based on the fact that Blackstone supposedly did not learn about the criminal charge against him until he applied for a job after his termination and because he believed that ASI had contacted various agencies about the allegations only *after* he filed his Charge of Discrimination with the MCHR. Blackstone opined that ASI "conducted this investigation, if there was an investigation, with one thing in mind and that was to terminate [him]."

The undisputable evidence, however, undermines this conjecture. ASI contacted the Calvert County Sheriff's Office, the Office of Health Care Quality, and the Calvert County Office on Aging and reported the complaint on June 5, 2003, eighteen days *before* Blackstone filed his complaint with MCHR**.** In addition, Detective Hollinger unequivocally states that ASI had no input into his decision to press charges, which ASI may not even have known about. The record is devoid of evidence to support

8

Blackstone's assertion that ASI's investigation was conducted with the sole purpose of terminating him with discriminatory animus. His own speculation of disparate treatment is insufficient to withstand a motion for summary judgment. *See Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (party opposing summary judgment cannot create a genuine issue of material fact through speculation or the building of one inference upon another).

Though a member of a protected class, Blackstone has not demonstrated that any employee outside his protected class engaged in conduct comparable in seriousness to what he was alleged to have done. *See Cook*, 988 F.2d at 511. Nor has he produced evidence indicating that any similarly-situated white employee was treated more favorably in the investigation of similarly severe allegations or with respect to the discipline that was dispensed.[3] Nursing Director Murray states that in the five years she worked at ASI, no employee–other than Blackstone–was ever accused of intentionally physically assaulting a resident.

The Court GRANTS ASI's Motion for Summary Judgment as to the disparate treatment claim.

---

[3] Blackstone points to a white employee who was terminated, then brought back. Murray believes that Blackstone may be referring to Jennifer Zieman, who was terminated because of an attendance problem and who then protested the termination, claiming it was the result of a failure in communication. Blackstone also believes Ann Swales was treated more favorably than he. Swales was terminated for having inappropriate verbal communication with a resident. Finally, Blackstone claims that an "Evonna Coleman" was accused of mistreating a patient. While no one with that exact name has worked at ASI, ASI suggests that an employee named Jevannah Coleman was terminated for falsifying time records. Assuming all these individuals were outside Blackstone's protected class, none of the misconduct they were alleged to have engaged in approaches in seriousness that with which Blackstone was charged.

## V.

## Wrongful Discharge

Blackstone next asserts a claim for wrongful discharge in violation of 42 U.S.C. § 1981 and Title VII, alleging that ASI terminated him due to his race and color. ASI argues that Blackstone has failed to establish a prima facie case of discriminatory discharge, and, even if he has, that the corroborated report of an assault on an elderly resident was a legitimate, non-discriminatory reason for terminating him.

Section 1981 prohibits discrimination based on race in the making and enforcement of private contracts. 42 U.S.C. § 1981(a). It proscribes only purposeful discrimination. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391 (1982). Title VII makes it "an unlawful employment practice for an employer ... to discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "[T]he framework of proof for disparate treatment claims is the same for actions brought under Title VII or § 1981, or both statutes." *Bryant v. Aiken Reg. Med. Ctrs. Inc.*, 333 F.3d 536, 545 n.3 (4th Cir. 2003).

A plaintiff can prove discriminatory intent in employment practice either by producing direct evidence of discriminatory animus or through the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Since Blackstone cites no direct evidence of discriminatory intent, he must rely on the *McDonnell Douglas* framework. He must therefore first establish a prima facie case of discrimination, at which point the burden of production will shift to the defendant employer to establish a legitimate, nondiscriminatory explanation for the employment action. *Id*. If ASI is able to produce such a legitimate nondiscriminatory reason, the burden then will shift back

10

to Blackstone to show by a preponderance of evidence that the proffered reason was a pretext for

discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To establish a

prima facie case of discriminatory discharge, a plaintiff must demonstrate that (1) he is a member of a

protected class; (2) he suffered from an adverse employment action; (3) at the time the employer took

the adverse employment action he was performing at a level that met his employer's legitimate

expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class.

*King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Blackstone has failed to establish a prima facie case of discriminatory discharge.[4] As an African

American, he is a member of a protected class and he unquestionably suffered an adverse employment

action when he was terminated from his position. However, beyond simply asserting that he never

missed any days of work, never had any problems with his co-workers, and declaring that nothing in his

employment record suggested he would mistreat an elderly person, he has not provided any objective

evidence that he was performing at a level that met his employer's legitimate expectations.[5]   ASI

emphasizes that it found Blackstone's job performance less than satisfactory precisely because of the

two allegations of resident abuse, the second of which was brought by a lucid resident and confirmed by

her equally competent and reliable sister. Finally, Blackstone falters with respect to the fourth element of

---

[4] Although *pro se* pleadings are held to less stringent standards than pleadings drafted by attorneys, *see White v. White*, 886 F.2d 721, 722-723 (4th Cir. 1989), construction of such pleadings is not without limits. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

[5] As noted earlier, however, documents obtained during discovery in this case in fact indicate that Blackstone had been accused of improperly treating elderly persons in prior employment positions, allegations that Blackstone never chose to contest. ASI does not claim that it relied on this information in making its decision to terminate him.

a prima facie case because following his termination, Belinda Edwards, an African American woman, was hired to replace him.

In any case, assuming arguendo that Blackstone could establish a prima facie case, ASI has provided a legitimate, non-discriminatory reason for terminating him. *McDonnell Douglas,* 411 U.S. at 802. An allegation of patient abuse is a legitimate, non-discriminatory reason for an adverse employment action. *See Billups v. Methodist Hospital of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991). Blackstone can point to no evidence demonstrating that ASI's explanation for his termination was a pretext for illegal discrimination. To the contrary, one of the people involved in the decision-making process, ASI Vice President Waack, was not even aware of Blackstone's race when deciding to terminate him.

ASI is entitled to summary judgment on the wrongful discharge claim.

## VI.

## Malicious Prosecution

Blackstone's claim for malicious prosecution hinges on his belief that ASI improperly caused the Calvert County Sheriff's Office to arrest and charge him with second degree assault. Under Maryland law, to establish a claim for malicious prosecution, a plaintiff must establish that (1) a criminal proceeding was instituted or continued by the defendant against him; (2) it terminated in his favor; (3) there was an absence of probable cause for the proceeding; and (4) the defendant acted with malice or for a purpose other than bringing the plaintiff to justice. *S. Mgmt Corp. v. Taha*, 836 A.2d 627, 637 (Md., 2003). A plaintiff must produce evidence satisfying all four elements to succeed. *Nasim v. Tandy Corp.*, 726 F. Supp 1021, 1023 n.4 (D. Md. 1989), *aff'd* 902 F.2d 1566 (4th Cir. 1990).

Under Maryland law, an institution such as ASI has an obligation to report any allegation of

abuse to an appropriate law enforcement agency, the State Department of Health and Mental Hygiene

or the Department of Aging. Md. Code Ann., Health-Gen'l, § 19-347(b) (2000).[6] In addition,

regulations adopted by the Maryland Department of Health and Mental Hygiene require a licensee or

employee of an assisted living program to report suspected abuse. COMAR 10.07.14.27.C.[7]

Individuals who fail to report suspected abuse within three days are subject to a civil fine. Md. Code

Ann., Health-Gen'l, § 19-347(c).[8] Accordingly, ASI had no discretion as to whether to report the

resident's allegation of assault to the Calvert County Sheriff's Office. To the extent that Blackstone's

malicious prosecution claim turns on ASI reporting the alleged abuse or participating in an investigation

of that abuse, the claim is clearly barred. *See* Md. Code Ann., Health-Gen'l, § 19-347(b) (2000). *See*

*also* Md. Code Ann., Cts. & Jud. Proc., § 5-630 (2002).

Immunity aside, Blackstone's claim is meritless. He simply assumes, without offering the least

evidence, that ASI must have influenced the decision to press charges against him because Detective

Hollinger supposedly submitted his application for statement of charges to the District Court

---

[6] Section 19-347(b) provides: "(1) A person who believes that a resident of a related institution has been abused shall report promptly the alleged abuse to an appropriate law enforcement agency, the Secretary, or the Department of Aging; (2) A report: (i) May be oral or written; and (ii) Shall contain as much information as the reporter is able to provide."

[7] COMAR 10.07.14.27.C states, "(1) A licensee or employee of an assisted living program who believes that a resident has been subjected to abuse, neglect, or exploitation shall report the alleged abuse, neglect or exploitation within 24 hours to: (a) the appropriate local department of social services, adult protective services office; and (b) One or more of the following: (i) A local law enforcement agency, (ii) The Licensing and Certification Administration of the Department, (iii) A representative of the Long-Term Care Ombudsman Program in the Department of Aging or local area agency on aging."

[8] Section 19-347(c) states, "Any employee of a related institution who is required to report alleged abuse under subsection (b) of this section, and who fails to report the alleged abuse within 3 days after learning of the alleged abuse, is liable for a civil penalty of not more than $1000."

13

Commissioner's Office a few days after the notice of charge of discrimination was mailed by MCHR to ASI. This assumption is conclusively put to rest by Hollinger's affirmation that, after receiving the initial report from ASI, he was given no further assistance or input from ASI in deciding whether to proceed.

Nor has Blackstone demonstrated that ASI lacked probable cause to report the allegations to the Calvert County Sheriff's Office. Under Maryland law, probable cause exists when there is "a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty." *Alvarez v. Montgomery County*, 147 F.3d 354, 360 (4th Cir. 1998). Probable cause does not require that the evidence be sufficient to convict. *Id*. In this case, ASI had received an allegation of abuse from a resident that was confirmed in neutral fashion by her sister, where both women were found to be mentally competent and physically capable of observation. In addition, Detective Hollinger, who investigated the matter, determined for himself that there was sufficient evidence to file an application for charges with the Commissioner's Office in Calvert County. The Commissioner's Office decided to issue a criminal summons against Blackstone, finding probable cause to do so. Even Blackstone, on deposition, admitted that ASI had probable cause to report the resident's allegation of abuse.

Finally, Blackstone has in no way shown that ASI acted with "malice." Malice in the  context of malicious prosecution is defined as "a wrongful or improper motive in initiating legal proceedings against the plaintiff." *Alvarez*, 147 F.3d at 360. Based on all the considerations previously discussed, ASI could fairly conclude that an assault on a resident had actually occurred.

Whether based on immunity from prosecution or on the merits, Blackstone's claim of malicious prosecution goes out on summary judgment.

14

# VII.

## Defamation

Blackstone also contends that ASI published a defamatory communication when it reported the resident's allegations to the Calvert County Sheriff's Office, Maryland Board of Nursing, Calvert County Office of Aging and Office of Health Care Quality. Under Maryland law, to establish defamation when the plaintiff is not a public figure, the plaintiff must prove that (1) the defendant made a defamatory communication to a third person; (2) the statement was false; (3) the defendant was at fault in communicating the statement; and (4) the plaintiff suffered harm. *Murray v. United Food and Commercial Workers Int'l Union,* 289 F.3d 297, 305 (4th Cir. 2002). Again, Blackstone cannot prevail.

Anyone who makes a report required by § 19-347 of the Health General Article of the Maryland Code is immune from suit regardless of the legal theory asserted against him. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-630 (2002)[9]; COMAR § 10.07.14.27.F. Immunity is also conferred upon an individual making the required report to the State Board of Nursing. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-709(b)[10]. If that were not enough, the common law confers a conditional privilege for statements whose publication "advances social policies of greater importance than the vindication of a

---

[9] Section 5-631 states, "(a) A person who acts in good faith is not civilly liable for: (1) Making a report under § 19-347 of the Health-General Article; (2) Participating in an investigation arising out of a report under § 19-347 of the Health-General Article; (3) Participating in a judicial proceeding arising out of a report under § 19-347 of the Health-General Article; or (4) Participating in transferring, suspending or terminating the employment of any individual who is believed to have abused or aided in abusing a resident under § 19-347 of the Health-General Article."

[10] "(b) An individual who acts without malice is not civilly liable for making a report as required by § 8-505 of the Health Occupations Article."

plaintiff's reputational interest." *Ransom v. Baltimore County*, 111 F. Supp.2d 704, 711 (D. Md. 2000) (quoting *Marchesi v. Franchino*, 283 Md. 131, 135, 387 A.2d 1129, 1131 (1978). One of those "social policies of greater importance" is most assuredly protecting elderly residents in retirement facilities from abuse. Therefore, even if the allegations concerning Blackstone were later determined to be unsubstantiated, ASI cannot be held liable for reporting the allegations to the appropriate agencies.

Again, ASI was required by law to report any allegation of resident abuse that it believed to be true. *See* Md. Code Ann., Health-Gen'l, §19-347(b); COMAR 10.07.14.27.C. In addition, Maryland requires licensed nursing personnel who know of actions or conditions that may violate practice standards or law to report those actions or conditions to the State Board of Nursing. *See* Md. Ann. Code, Health Occupations, § 8-505(a) (2000).[11] Actions or conditions falling within this statute include practicing as a nursing assistant in a manner that fails to meet generally accepted standards for the practice of a nursing assistant; and physically, verbally, or psychologically abusing, neglecting, or otherwise harming such a person under the applicant or certificate holder's care. *See* Md. Ann. Code, Health Occupations, § 8-6A-10(a) (2000). A certified medicine aide such as Blackstone is a certified nursing assistant. *See* Md. Code Ann., Health Occupations, § 8-6A-01(e) & (f) (2000). As a result, ASI had a legal obligation to report allegations of abuse by an elderly resident to the aforementioned agencies.

ASI is entitled to summary judgment on the defamation count.

---

[11] Section 8-505 of the Health Occupations Art., Md. Ann. Code, provides: "(1) If a nursing administrator, registered nurse, or licensed practical nurse knows of an action or condition that might be grounds for action under § 8-316 or Subtitle 6A of this title, the nursing administrator, registered nurse, or licensed practical nurse shall report the action or condition to the Board."

**VIII.**

**Intentional Interference with Prospective Advantage**

Finally, Blackstone claims that ASI intentionally and willfully reported unsubstantiated allegations about his alleged abuse to the various state agencies, knowing that the reports would cause damage to his career in the nursing field, and that in fact the reports occasioned economic and non-economic damages. To succeed on a claim for intentional interference with prospective advantage, a plaintiff must prove (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in his lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; with (4) actual damage and loss resulting. *Mates v. N. Am. Vaccine, Inc.,* 53 F. Supp.2d 814, 828 (D. Md. 1999).

Again, immunity blocks Blackstone's path and again Blackstone's claim fails on the merits. He cannot establish the first three elements of the tort: (1) that the reports to the agencies were "intentional or willful," given that the reports were legally mandated and the allegations were confirmed by the resident's sister; (2) that the reports to the agencies were "calculated to cause damage" or (3) that they were "done with the unlawful purpose to cause such damage and loss without justifiable cause." Indeed, it is likely that Blackstone's difficulty in finding employment in nursing facilities after being terminated by ASI certainly has had as much to do with his previous employment record as it has had with his employment at ASI.

Blackstone has no cause of action for intentional interference with prospective advantage.

## IX.

For the foregoing reasons, the Court GRANTS ASI's Motion for Summary Judgment and Final

Judgment will be ENTERED in favor of ASI and against Blackstone. A Separate Order will issue.


July 15, 2005                                              _____/s/_____
                                                          PETER J. MESSITTE
                                                          UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STEVEN BLACKSTONE,** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | CIVIL NO. PJM-04-1180 |
| | * | |
| **ASBURY-SOLOMON'S ISLAND**, | * | |
| | * | |
| Defendant | * | |

## OPINION

### I.

Steven Blackstone, pro se,[1] has sued Asbury-Solomon's Island ("ASI"), claiming discriminatory treatment based on race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, *et seq.,* ("Title VII") and 42 U.S.C. §1981 ("Section 1981") (Count 1); wrongful discharge in violation of Title VII and Section 1981 (Count 2); malicious prosecution (Count 3); defamation (Count 4); and tortious interference with prospective advantage (Count 5). ASI has filed a Motion for Summary Judgment, which Blackstone opposes. The Court will GRANT the Motion.

---

[1] Though previously represented, Blackstone is now proceeding *pro se.*

1

## II.

ASI is a not-for-profit continuing-care retirement community located in Solomon's Island, Calvert County, Maryland. It provides residential living, assisted living, and skilled nursing care to elderly residents. Nursing care, which includes rehabilitative and long-term care to residents with specialized healthcare needs, is provided in ASI's Health Care Center. The Health Care Center is licensed by the State of Maryland and is a certified Medicare provider.

Steven Blackstone was hired in November of 2001 as a Certified Medicine Aide (CMA) and assigned to the Health Care Center. As a CMA, Blackstone was charged with ordering and distributing medicines to elderly patients as well as keeping the medication cart clean.

On February 22, 2003, a resident at the Center told Pat Smawley, the Charge Nurse, that a male employee had "sexed her anus." A few days later, Smawley reported the allegation to Samantha Murray, Director of Nursing, who initiated an investigation in conformity with ASI's Policy on Abuse/Neglect of Residents. Initial indications pointed to Blackstone as the perpetrator and he was placed on suspension pending investigation. Nursing Director Murray and Lisa Caudle, a social worker, then conducted a documented interview of the 94 year-old resident, who repeated the sodomy allegations. Since Blackstone was the only male medicine aide who had provided care to the resident, and because the resident's description matched him, they concluded that the resident was complaining of him.

At the end of February, pursuant to Maryland law and the ASI Resident Abuse Policy, Murray reported these allegations and the results of ASI's investigation to the Calvert County Office on Aging, the

Office of Health Care Quality[2], and the Calvert County Sheriff's Office. The Calvert County Sheriff's Office then sent Detective Hollinger to ASI to investigate. When Hollinger arrived, Murray advised him that the resident making the abuse allegation suffered from dementia affecting her memory as well as macular degeneration, a condition that causes loss of vision. Murray also told Hollinger that Blackstone had administered suppositories to the resident during the time in which the assault was claimed to have occurred. Hollinger interviewed Blackstone, who denied any wrongdoing, but the resident refused to speak to Hollinger, stating she wanted to forget the incident . Based on these facts, both Hollinger and ASI found the allegations unsubstantiated and closed the case. Shortly thereafter Blackstone was permitted to return to work. Murray contacted the state and local agencies to tell them the results of the investigation.

A few months later, on June 4, 2003, another  resident in ASI's Assisted Living Facility told Assisted Living Coordinator Shelley Tilley that Blackstone made her anxious. When Tilley inquired as to the reason, the resident stated that a year earlier, while she was a resident in the Health Care Center, Blackstone had reached into her blouse and attempted to touch her breast. The resident stated that she had reported the incident to Bobbie Catterton, a former employee of ASI, but that she had asked Catterton to keep the information confidential. The next morning Tilley reported these allegations to Murray.

Murray initiated an investigation into this second incident. She also advised ASI Acting Administrator Frank Krohnert of the allegations. On June 5, Murray and Caudle conducted a documented interview of the resident, who reaffirmed her allegations and who stated moreover that her sister had witnessed the incident.  The resident then gave Murray and Caudle permission to interview her sister. Caudle interviewed

---

[2] The Office of Health Care Quality is the state agency responsible for claims of patient abuse.

3

the sister and asked if she recalled an incident between the resident and Blackstone about a year ago that was inappropriate. The sister confirmed the resident's story. Caudle also interviewed other employees who worked with Blackstone and who provided care to the resident making the allegations. Though ASI did not interview Catterton (who now claims to never have been told of the incident), a current staff member, Amy Thayer, reported that the complaining resident had told her of the incident a year earlier, and that Thayer had reported it to her supervisor but did not know what happened after that.

On the afternoon of June 5, Krohnert reported the second incident to the Calvert County Sheriff's Office. Detective Hollinger returned to ASI and interviewed the resident, the resident's sister and Blackstone. Blackstone denied these new allegations, stating that the resident and her sister never liked him and, though he did not know why, he suspected it was because he is African American. While Hollinger attests that Blackstone never cited any reason for suspecting that the resident made the allegations against him because of his race, Blackstone claims he told Hollinger that one of the resident's favorite words was "nigger."

The same day Hollinger interviewed Blackstone, Krista DiGeorge, ASI's Director of Human Resources, and Krohnert also interviewed him. During the interview, Blackstone told them he did not take the resident's allegations against him seriously and could not believe that they were doing so. Blackstone also stated  that he was a good-looking married man who had no reason to assault an elderly woman in that manner,  that he enjoyed his job and the fitness center at ASI, and that he had not missed a day of work. Blackstone stated that he was shocked that ASI would handle the investigation "in such a way that they would think [he] was guilty," which he inferred from the "here we go again" comment made by Krohnert during the interview. For his part, Krohnert contends that at no point during the interview did Blackstone

4

ever claim that the resident had fabricated the incident because of his race. Krohnert et al found both the resident and her sister to be lucid and that neither suffered from any medical condition that would affect their ability to observe or recall. In consequence, Murray, Krohnert, ASI Vice President Ron Waack, and ASI Executive Director Sue DaCamara decided to terminate Blackstone's employment. ASI contends that its decision had nothing to do with Blackstone's race. Waack, one of the individuals who voted to terminate Blackstone, affirms he did not even know Blackstone's race when he made his decision. After Blackstone was terminated, ASI hired Belinda Edwards, an African American woman, to replace him.

Murray reported the second resident's complaint and ASI's investigation of it to the Office of Health Care Quality and the Calvert County Office on Aging. On June 11,  Murray also forwarded a complaint form describing the resident's allegations to the Maryland Board of Nursing.

In a matter of days, Blackstone filed a charge of discrimination with the Maryland Commission on Human Relations (MCHR) and the EEOC. On July 3, the MCHR sent ASI a letter notifying it of the charge and asking it either to respond in writing to each allegation or to resolve the complaint through mediation. ASI did not immediately respond.

On July 7, Detective Hollinger submitted an application for statement of charges against Blackstone for second degree assault to the Commissioner's Office of the District Court for Calvert County. Approximately six weeks later, however, the state prosecutor entered a nolle prosequi on the assault charge and some three months after that the District Court for Calvert County expunged Blackstone's record. On April 7, 2004, the Maryland Board of Nursing informed Plaintiff that it had voted not to revoke his license.

Blackstone claims that because ASI reported the allegations to the various state and local agencies, he has been unable to secure nursing home employment since that time. In contrast, during discovery in the

5

present case, ASI uncovered documentation indicating that on two prior occasions at another nursing home Blackstone was accused of inappropriate touching of patients and that he apparently did not contest those allegations, resigning and then not calling or appearing for work before the effective date of his resignation. In addition, ASI discovered documents tending to show that Blackstone had either resigned or was terminated from positions at other nursing centers in the area.

## III.

Summary judgment is appropriate if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When a moving party supports his or her motion with affidavits and other appropriate materials, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the . . . response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A mere scintilla of evidence supporting the case is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is mandated where, after adequate time for discovery, a party fails to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

6

## IV.

### Disparate Treatment

Blackstone's claim of disparate treatment is based upon his belief that because of his race and color, ASI did not "thoroughly" and "impartially" investigate the allegations against him, and that other "similarly situated caucasian/white employees were treated more favorably during the investigative process and in the administration of discipline based on their race/color."

An employee may establish disparate treatment in the disciplinary process by demonstrating that the employer deviated from its standard procedure. *See Trammell v. Baltimore Gas & Electric*, 279 F. Supp.2d 646, 657 (D.Md. 2003). The employee may establish a prima facie case of racial or color animus by showing that (1) he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).

Blackstone has satisfied none of these elements. He has not shown that ASI deviated from the "Procedure for Handling Suspected Abuse of Residents" section of its Policy on Abuse/Neglect of Residents nor has he shown that similarly situated individuals outside his protected class were treated more favorably than he.

ASI's investigation of the allegations against him was consistent with its Policy on Abuse/Neglect of Residents. At the beginning of the investigation, Nursing Director Murray reviewed the procedures for investigating allegations of resident abuse. Repeatedly throughout the process, she conferred with ASI Acting Administrator Krohnert to make sure she was following that protocol. ASI conducted

7

documented interviews with the alleged victim, the alleged victim's sister, witnesses who worked with both Blackstone and the alleged victim, and with Blackstone himself. ASI also reviewed the medical records of both the alleged victim and her sister to determine the extent to which their mental and physical conditions might have affected their ability to observe and recall. While it is true that former ASI employee Catterton was not contacted during the investigation and that she now denies that the resident told her of the incident a year prior, another employee, Amy Thayer, reported that the resident had in fact made the allegation to her a year earlier.

When asked on deposition why he thought ASI's investigation was incomplete and biased, Blackstone could only surmise that "they could have somehow just looked at [him] in a different light," and that the investigation was conducted in a way that made him believe they thought "all black people were alike and that the allegations didn't really merit a thorough investigation or even an impartial investigation." This impression was based on the fact that Blackstone supposedly did not learn about the criminal charge against him until he applied for a job after his termination and because he believed that ASI had contacted various agencies about the allegations only *after* he filed his Charge of Discrimination with the MCHR. Blackstone opined that ASI "conducted this investigation, if there was an investigation, with one thing in mind and that was to terminate [him]."

The undisputable evidence, however, undermines this conjecture. ASI contacted the Calvert County Sheriff's Office, the Office of Health Care Quality, and the Calvert County Office on Aging and reported the complaint on June 5, 2003, eighteen days *before* Blackstone filed his complaint with MCHR**.** In addition, Detective Hollinger unequivocally states that ASI had no input into his decision to press charges, which ASI may not even have known about. The record is devoid of evidence to support

8

Blackstone's assertion that ASI's investigation was conducted with the sole purpose of terminating him with discriminatory animus. His own speculation of disparate treatment is insufficient to withstand a motion for summary judgment. *See Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (party opposing summary judgment cannot create a genuine issue of material fact through speculation or the building of one inference upon another).

Though a member of a protected class, Blackstone has not demonstrated that any employee outside his protected class engaged in conduct comparable in seriousness to what he was alleged to have done. *See Cook*, 988 F.2d at 511. Nor has he produced evidence indicating that any similarly-situated white employee was treated more favorably in the investigation of similarly severe allegations or with respect to the discipline that was dispensed.[3] Nursing Director Murray states that in the five years she worked at ASI, no employee–other than Blackstone–was ever accused of intentionally physically assaulting a resident.

The Court GRANTS ASI's Motion for Summary Judgment as to the disparate treatment claim.

---

[3] Blackstone points to a white employee who was terminated, then brought back. Murray believes that Blackstone may be referring to Jennifer Zieman, who was terminated because of an attendance problem and who then protested the termination, claiming it was the result of a failure in communication. Blackstone also believes Ann Swales was treated more favorably than he. Swales was terminated for having inappropriate verbal communication with a resident. Finally, Blackstone claims that an "Evonna Coleman" was accused of mistreating a patient. While no one with that exact name has worked at ASI, ASI suggests that an employee named Jevannah Coleman was terminated for falsifying time records. Assuming all these individuals were outside Blackstone's protected class, none of the misconduct they were alleged to have engaged in approaches in seriousness that with which Blackstone was charged.

## V.

## Wrongful Discharge

Blackstone next asserts a claim for wrongful discharge in violation of 42 U.S.C. § 1981 and Title VII, alleging that ASI terminated him due to his race and color. ASI argues that Blackstone has failed to establish a prima facie case of discriminatory discharge, and, even if he has, that the corroborated report of an assault on an elderly resident was a legitimate, non-discriminatory reason for terminating him.

Section 1981 prohibits discrimination based on race in the making and enforcement of private contracts. 42 U.S.C. § 1981(a). It proscribes only purposeful discrimination. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391 (1982). Title VII makes it "an unlawful employment practice for an employer ... to discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "[T]he framework of proof for disparate treatment claims is the same for actions brought under Title VII or § 1981, or both statutes." *Bryant v. Aiken Reg. Med. Ctrs. Inc.*, 333 F.3d 536, 545 n.3 (4th Cir. 2003).

A plaintiff can prove discriminatory intent in employment practice either by producing direct evidence of discriminatory animus or through the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Since Blackstone cites no direct evidence of discriminatory intent, he must rely on the *McDonnell Douglas* framework. He must therefore first establish a prima facie case of discrimination, at which point the burden of production will shift to the defendant employer to establish a legitimate, nondiscriminatory explanation for the employment action. *Id*. If ASI is able to produce such a legitimate nondiscriminatory reason, the burden then will shift back

10

to Blackstone to show by a preponderance of evidence that the proffered reason was a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To establish a prima facie case of discriminatory discharge, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered from an adverse employment action; (3) at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Blackstone has failed to establish a prima facie case of discriminatory discharge.[4] As an African American, he is a member of a protected class and he unquestionably suffered an adverse employment action when he was terminated from his position. However, beyond simply asserting that he never missed any days of work, never had any problems with his co-workers, and declaring that nothing in his employment record suggested he would mistreat an elderly person, he has not provided any objective evidence that he was performing at a level that met his employer's legitimate expectations.[5]  ASI emphasizes that it found Blackstone's job performance less than satisfactory precisely because of the two allegations of resident abuse, the second of which was brought by a lucid resident and confirmed by her equally competent and reliable sister. Finally, Blackstone falters with respect to the fourth element of

---

[4] Although *pro se* pleadings are held to less stringent standards than pleadings drafted by attorneys, *see White v. White*, 886 F.2d 721, 722-723 (4th Cir. 1989), construction of such pleadings is not without limits. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

[5] As noted earlier, however, documents obtained during discovery in this case in fact indicate that Blackstone had been accused of improperly treating elderly persons in prior employment positions, allegations that Blackstone never chose to contest. ASI does not claim that it relied on this information in making its decision to terminate him.

a prima facie case because following his termination, Belinda Edwards, an African American woman, was hired to replace him.

In any case, assuming arguendo that Blackstone could establish a prima facie case, ASI has provided a legitimate, non-discriminatory reason for terminating him. *McDonnell Douglas,* 411 U.S. at 802. An allegation of patient abuse is a legitimate, non-discriminatory reason for an adverse employment action. *See Billups v. Methodist Hospital of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991). Blackstone can point to no evidence demonstrating that ASI's explanation for his termination was a pretext for illegal discrimination. To the contrary, one of the people involved in the decision-making process, ASI Vice President Waack, was not even aware of Blackstone's race when deciding to terminate him.

ASI is entitled to summary judgment on the wrongful discharge claim.

## VI.

## Malicious Prosecution

Blackstone's claim for malicious prosecution hinges on his belief that ASI improperly caused the Calvert County Sheriff's Office to arrest and charge him with second degree assault. Under Maryland law, to establish a claim for malicious prosecution, a plaintiff must establish that (1) a criminal proceeding was instituted or continued by the defendant against him; (2) it terminated in his favor; (3) there was an absence of probable cause for the proceeding; and (4) the defendant acted with malice or for a purpose other than bringing the plaintiff to justice. *S. Mgmt Corp. v. Taha*, 836 A.2d 627, 637 (Md., 2003). A plaintiff must produce evidence satisfying all four elements to succeed. *Nasim v. Tandy Corp.*, 726 F. Supp 1021, 1023 n.4 (D. Md. 1989), *aff'd* 902 F.2d 1566 (4th Cir. 1990).

Under Maryland law, an institution such as ASI has an obligation to report any allegation of abuse to an appropriate law enforcement agency, the State Department of Health and Mental Hygiene or the Department of Aging. Md. Code Ann., Health-Gen'l, § 19-347(b) (2000).[6] In addition, regulations adopted by the Maryland Department of Health and Mental Hygiene require a licensee or employee of an assisted living program to report suspected abuse. COMAR 10.07.14.27.C.[7] Individuals who fail to report suspected abuse within three days are subject to a civil fine. Md. Code Ann., Health-Gen'l, § 19-347(c).[8] Accordingly, ASI had no discretion as to whether to report the resident's allegation of assault to the Calvert County Sheriff's Office. To the extent that Blackstone's malicious prosecution claim turns on ASI reporting the alleged abuse or participating in an investigation of that abuse, the claim is clearly barred. *See* Md. Code Ann., Health-Gen'l, § 19-347(b) (2000). *See also* Md. Code Ann., Cts. & Jud. Proc., § 5-630 (2002).

Immunity aside, Blackstone's claim is meritless. He simply assumes, without offering the least evidence, that ASI must have influenced the decision to press charges against him because Detective Hollinger supposedly submitted his application for statement of charges to the District Court

---

[6] Section 19-347(b) provides: "(1) A person who believes that a resident of a related institution has been abused shall report promptly the alleged abuse to an appropriate law enforcement agency, the Secretary, or the Department of Aging; (2) A report: (i) May be oral or written; and (ii) Shall contain as much information as the reporter is able to provide."

[7] COMAR 10.07.14.27.C states, "(1) A licensee or employee of an assisted living program who believes that a resident has been subjected to abuse, neglect, or exploitation shall report the alleged abuse, neglect or exploitation within 24 hours to: (a) the appropriate local department of social services, adult protective services office; and (b) One or more of the following: (i) A local law enforcement agency, (ii) The Licensing and Certification Administration of the Department, (iii) A representative of the Long-Term Care Ombudsman Program in the Department of Aging or local area agency on aging."

[8] Section 19-347(c) states, "Any employee of a related institution who is required to report alleged abuse under subsection (b) of this section, and who fails to report the alleged abuse within 3 days after learning of the alleged abuse, is liable for a civil penalty of not more than $1000."

Commissioner's Office a few days after the notice of charge of discrimination was mailed by MCHR to

ASI. This assumption is conclusively put to rest by Hollinger's affirmation that, after receiving the initial

report from ASI, he was given no further assistance or input from ASI in deciding whether to proceed.

Nor has Blackstone demonstrated that ASI lacked probable cause to report the allegations to

the Calvert County Sheriff's Office. Under Maryland law, probable cause exists when there is "a

reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a

cautious man in believing that the accused is guilty." *Alvarez v. Montgomery County*, 147 F.3d 354,

360 (4th Cir. 1998). Probable cause does not require that the evidence be sufficient to convict. *Id*. In

this case, ASI had received an allegation of abuse from a resident that was confirmed in neutral fashion

by her sister, where both women were found to be mentally competent and physically capable of

observation. In addition, Detective Hollinger, who investigated the matter, determined for himself that

there was sufficient evidence to file an application for charges with the Commissioner's Office in Calvert

County. The Commissioner's Office decided to issue a criminal summons against Blackstone, finding

probable cause to do so. Even Blackstone, on deposition, admitted that ASI had probable cause to

report the resident's allegation of abuse.

Finally, Blackstone has in no way shown that ASI acted with "malice." Malice in the  context of

malicious prosecution is defined as "a wrongful or improper motive in initiating legal proceedings against

the plaintiff." *Alvarez*, 147 F.3d at 360. Based on all the considerations previously discussed, ASI could

fairly conclude that an assault on a resident had actually occurred.

Whether based on immunity from prosecution or on the merits, Blackstone's claim of malicious

prosecution goes out on summary judgment.

14

# VII.

## Defamation

Blackstone also contends that ASI published a defamatory communication when it reported the resident's allegations to the Calvert County Sheriff's Office, Maryland Board of Nursing, Calvert County Office of Aging and Office of Health Care Quality. Under Maryland law, to establish defamation when the plaintiff is not a public figure, the plaintiff must prove that (1) the defendant made a defamatory communication to a third person; (2) the statement was false; (3) the defendant was at fault in communicating the statement; and (4) the plaintiff suffered harm. *Murray v. United Food and Commercial Workers Int'l Union,* 289 F.3d 297, 305 (4th Cir. 2002). Again, Blackstone cannot prevail.

Anyone who makes a report required by § 19-347 of the Health General Article of the Maryland Code is immune from suit regardless of the legal theory asserted against him. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-630 (2002)[9]; COMAR § 10.07.14.27.F. Immunity is also conferred upon an individual making the required report to the State Board of Nursing. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-709(b)[10]. If that were not enough, the common law confers a conditional privilege for statements whose publication "advances social policies of greater importance than the vindication of a

---

[9] Section 5-631 states, "(a) A person who acts in good faith is not civilly liable for: (1) Making a report under § 19-347 of the Health-General Article; (2) Participating in an investigation arising out of a report under § 19-347 of the Health-General Article; (3) Participating in a judicial proceeding arising out of a report under § 19-347 of the Health-General Article; or (4) Participating in transferring, suspending or terminating the employment of any individual who is believed to have abused or aided in abusing a resident under § 19-347 of the Health-General Article."

[10] "(b) An individual who acts without malice is not civilly liable for making a report as required by § 8-505 of the Health Occupations Article."

15

plaintiff's reputational interest." *Ransom v. Baltimore County*, 111 F. Supp.2d 704, 711 (D. Md. 2000) (quoting *Marchesi v. Franchino*, 283 Md. 131, 135, 387 A.2d 1129, 1131 (1978). One of those "social policies of greater importance" is most assuredly protecting elderly residents in retirement facilities from abuse. Therefore, even if the allegations concerning Blackstone were later determined to be unsubstantiated, ASI cannot be held liable for reporting the allegations to the appropriate agencies.

Again, ASI was required by law to report any allegation of resident abuse that it believed to be true. *See* Md. Code Ann., Health-Gen'l, §19-347(b); COMAR 10.07.14.27.C. In addition, Maryland requires licensed nursing personnel who know of actions or conditions that may violate practice standards or law to report those actions or conditions to the State Board of Nursing. *See* Md. Ann. Code, Health Occupations, § 8-505(a) (2000).[11] Actions or conditions falling within this statute include practicing as a nursing assistant in a manner that fails to meet generally accepted standards for the practice of a nursing assistant; and physically, verbally, or psychologically abusing, neglecting, or otherwise harming such a person under the applicant or certificate holder's care. *See* Md. Ann. Code, Health Occupations, § 8-6A-10(a) (2000). A certified medicine aide such as Blackstone is a certified nursing assistant. *See* Md. Code Ann., Health Occupations, § 8-6A-01(e) & (f) (2000). As a result, ASI had a legal obligation to report allegations of abuse by an elderly resident to the aforementioned agencies.

ASI is entitled to summary judgment on the defamation count.

---

[11] Section 8-505 of the Health Occupations Art., Md. Ann. Code, provides: "(1) If a nursing administrator, registered nurse, or licensed practical nurse knows of an action or condition that might be grounds for action under § 8-316 or Subtitle 6A of this title, the nursing administrator, registered nurse, or licensed practical nurse shall report the action or condition to the Board."

16

## VIII.

### Intentional Interference with Prospective Advantage

Finally, Blackstone claims that ASI intentionally and willfully reported unsubstantiated allegations about his alleged abuse to the various state agencies, knowing that the reports would cause damage to his career in the nursing field, and that in fact the reports occasioned economic and non-economic damages. To succeed on a claim for intentional interference with prospective advantage, a plaintiff must prove (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in his lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; with (4) actual damage and loss resulting. *Mates v. N. Am. Vaccine, Inc.,* 53 F. Supp.2d 814, 828 (D. Md. 1999).

Again, immunity blocks Blackstone's path and again Blackstone's claim fails on the merits. He cannot establish the first three elements of the tort: (1) that the reports to the agencies were "intentional or willful," given that the reports were legally mandated and the allegations were confirmed by the resident's sister; (2) that the reports to the agencies were "calculated to cause damage" or (3) that they were "done with the unlawful purpose to cause such damage and loss without justifiable cause." Indeed, it is likely that Blackstone's difficulty in finding employment in nursing facilities after being terminated by ASI certainly has had as much to do with his previous employment record as it has had with his employment at ASI.

Blackstone has no cause of action for intentional interference with prospective advantage.

17

**IX.**

For the foregoing reasons, the Court GRANTS ASI's Motion for Summary Judgment and Final

Judgment will be ENTERED in favor of ASI and against Blackstone. A Separate Order will issue.


July 15, 2005                                               _____/s/_____
                                                                    PETER J. MESSITTE
                                                            UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STEVEN BLACKSTONE,** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | CIVIL NO. PJM-04-1180 |
| | * | |
| **ASBURY-SOLOMON'S ISLAND**, | * | |
| | * | |
| Defendant | * | |

**OPINION**

**I**.

Steven Blackstone, pro se,[1] has sued Asbury-Solomon's Island ("ASI"), claiming discriminatory treatment based on race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, *et seq.,* ("Title VII") and 42 U.S.C. §1981 ("Section 1981") (Count 1); wrongful discharge in violation of Title VII and Section 1981 (Count 2); malicious prosecution (Count 3); defamation (Count 4); and tortious interference with prospective advantage (Count 5). ASI has filed a Motion for Summary Judgment, which Blackstone opposes. The Court will GRANT the Motion.

---

[1] Though previously represented, Blackstone is now proceeding *pro se*.

1

## II.

ASI is a not-for-profit continuing-care retirement community located in Solomon's Island, Calvert County, Maryland. It provides residential living, assisted living, and skilled nursing care to elderly residents. Nursing care, which includes rehabilitative and long-term care to residents with specialized healthcare needs, is provided in ASI's Health Care Center. The Health Care Center is licensed by the State of Maryland and is a certified Medicare provider.

Steven Blackstone was hired in November of 2001 as a Certified Medicine Aide (CMA) and assigned to the Health Care Center. As a CMA, Blackstone was charged with ordering and distributing medicines to elderly patients as well as keeping the medication cart clean.

On February 22, 2003, a resident at the Center told Pat Smawley, the Charge Nurse, that a male employee had "sexed her anus." A few days later, Smawley reported the allegation to Samantha Murray, Director of Nursing, who initiated an investigation in conformity with ASI's Policy on Abuse/Neglect of Residents. Initial indications pointed to Blackstone as the perpetrator and he was placed on suspension pending investigation. Nursing Director Murray and Lisa Caudle, a social worker, then conducted a documented interview of the 94 year-old resident, who repeated the sodomy allegations. Since Blackstone was the only male medicine aide who had provided care to the resident, and because the resident's description matched him, they concluded that the resident was complaining of him.

At the end of February, pursuant to Maryland law and the ASI Resident Abuse Policy, Murray reported these allegations and the results of ASI's investigation to the Calvert County Office on Aging, the

Office of Health Care Quality[2], and the Calvert County Sheriff's Office. The Calvert County Sheriff's Office then sent Detective Hollinger to ASI to investigate. When Hollinger arrived, Murray advised him that the resident making the abuse allegation suffered from dementia affecting her memory as well as macular degeneration, a condition that causes loss of vision. Murray also told Hollinger that Blackstone had administered suppositories to the resident during the time in which the assault was claimed to have occurred. Hollinger interviewed Blackstone, who denied any wrongdoing, but the resident refused to speak to Hollinger, stating she wanted to forget the incident . Based on these facts, both Hollinger and ASI found the allegations unsubstantiated and closed the case. Shortly thereafter Blackstone was permitted to return to work. Murray contacted the state and local agencies to tell them the results of the investigation.

A few months later, on June 4, 2003, another  resident in ASI's Assisted Living Facility told Assisted Living Coordinator Shelley Tilley that Blackstone made her anxious. When Tilley inquired as to the reason, the resident stated that a year earlier, while she was a resident in the Health Care Center, Blackstone had reached into her blouse and attempted to touch her breast. The resident stated that she had reported the incident to Bobbie Catterton, a former employee of ASI, but that she had asked Catterton to keep the information confidential. The next morning Tilley reported these allegations to Murray.

Murray initiated an investigation into this second incident. She also advised ASI Acting Administrator Frank Krohnert of the allegations. On June 5, Murray and Caudle conducted a documented interview of the resident, who reaffirmed her allegations and who stated moreover that her sister had witnessed the incident.  The resident then gave Murray and Caudle permission to interview her sister. Caudle interviewed

---

[2] The Office of Health Care Quality is the state agency responsible for claims of patient abuse.

3

the sister and asked if she recalled an incident between the resident and Blackstone about a year ago that was inappropriate. The sister confirmed the resident's story. Caudle also interviewed other employees who worked with Blackstone and who provided care to the resident making the allegations. Though ASI did not interview Catterton (who now claims to never have been told of the incident), a current staff member, Amy Thayer, reported that the complaining resident had told her of the incident a year earlier, and that Thayer had reported it to her supervisor but did not know what happened after that.

On the afternoon of June 5, Krohnert reported the second incident to the Calvert County Sheriff's Office. Detective Hollinger returned to ASI and interviewed the resident, the resident's sister and Blackstone. Blackstone denied these new allegations, stating that the resident and her sister never liked him and, though he did not know why, he suspected it was because he is African American. While Hollinger attests that Blackstone never cited any reason for suspecting that the resident made the allegations against him because of his race, Blackstone claims he told Hollinger that one of the resident's favorite words was "nigger."

The same day Hollinger interviewed Blackstone, Krista DiGeorge, ASI's Director of Human Resources, and Krohnert also interviewed him. During the interview, Blackstone told them he did not take the resident's allegations against him seriously and could not believe that they were doing so. Blackstone also stated  that he was a good-looking married man who had no reason to assault an elderly woman in that manner,  that he enjoyed his job and the fitness center at ASI, and that he had not missed a day of work. Blackstone stated that he was shocked that ASI would handle the investigation "in such a way that they would think [he] was guilty," which he inferred from the "here we go again"comment made by Krohnert during the interview. For his part, Krohnert contends that at no point during the interview did Blackstone

ever claim that the resident had fabricated the incident because of his race. Krohnert et al found both the resident and her sister to be lucid and that neither suffered from any medical condition that would affect their ability to observe or recall. In consequence, Murray, Krohnert, ASI Vice President Ron Waack, and ASI Executive Director Sue DaCamara decided to terminate Blackstone's employment. ASI contends that its decision had nothing to do with Blackstone's race. Waack, one of the individuals who voted to terminate Blackstone, affirms he did not even know Blackstone's race when he made his decision. After Blackstone was terminated, ASI hired Belinda Edwards, an African American woman, to replace him.

Murray reported the second resident's complaint and ASI's investigation of it to the Office of Health Care Quality and the Calvert County Office on Aging. On June 11,  Murray also forwarded a complaint form describing the resident's allegations to the Maryland Board of Nursing.

In a matter of days, Blackstone filed a charge of discrimination with the Maryland Commission on Human Relations (MCHR) and the EEOC. On July 3, the MCHR sent ASI a letter notifying it of the charge and asking it either to respond in writing to each allegation or to resolve the complaint through mediation. ASI did not immediately respond.

On July 7, Detective Hollinger submitted an application for statement of charges against Blackstone for second degree assault to the Commissioner's Office of the District Court for Calvert County. Approximately six weeks later, however, the state prosecutor entered a nolle prosequi on the assault charge and some three months after that the District Court for Calvert County expunged Blackstone's record. On April 7, 2004, the Maryland Board of Nursing informed Plaintiff that it had voted not to revoke his license.

Blackstone claims that because ASI reported the allegations to the various state and local agencies, he has been unable to secure nursing home employment since that time. In contrast, during discovery in the

5

present case, ASI uncovered documentation indicating that on two prior occasions at another nursing home

Blackstone was accused of inappropriate touching of patients and that he apparently did not contest those

allegations, resigning and then not calling or appearing for work before the effective date of his resignation.

In addition, ASI discovered documents tending to show that Blackstone had either resigned or was

terminated from positions at other nursing centers in the area.

## III.

Summary judgment is appropriate if "there is no genuine issue of material fact and . . . the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When a moving party

supports his or her motion with affidavits and other appropriate materials, the opposing party "may not

rest upon the mere allegations or denials of the adverse party's pleading, but the . . . response, by

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine

issue for trial." Fed. R. Civ. P. 56(e). A mere scintilla of evidence supporting the case is insufficient.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is proper "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

[being] no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). Summary judgment is mandated where, after adequate time for discovery, a party fails

to make a "showing sufficient to establish the existence of an element essential to that party's case, and

on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).

## IV.

## Disparate Treatment

Blackstone's claim of disparate treatment is based upon his belief that because of his race and color, ASI did not "thoroughly" and "impartially" investigate the allegations against him, and that other "similarly situated caucasian/white employees were treated more favorably during the investigative process and in the administration of discipline based on their race/color."

An employee may establish disparate treatment in the disciplinary process by demonstrating that the employer deviated from its standard procedure. *See Trammell v. Baltimore Gas & Electric*, 279 F. Supp.2d 646, 657 (D.Md. 2003). The employee may establish a prima facie case of racial or color animus by showing that (1) he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *Cook v. CSX Transp. Corp*., 988 F.2d 507, 511 (4th Cir. 1993).

Blackstone has satisfied none of these elements. He has not shown that ASI deviated from the "Procedure for Handling Suspected Abuse of Residents" section of its Policy on Abuse/Neglect of Residents nor has he shown that similarly situated individuals outside his protected class were treated more favorably than he.

ASI's investigation of the allegations against him was consistent with its Policy on Abuse/Neglect of Residents. At the beginning of the investigation, Nursing Director Murray reviewed the procedures for investigating allegations of resident abuse. Repeatedly throughout the process, she conferred with ASI Acting Administrator Krohnert to make sure she was following that protocol. ASI conducted

7

documented interviews with the alleged victim, the alleged victim's sister, witnesses who worked with both Blackstone and the alleged victim, and with Blackstone himself. ASI also reviewed the medical records of both the alleged victim and her sister to determine the extent to which their mental and physical conditions might have affected their ability to observe and recall. While it is true that former ASI employee Catterton was not contacted during the investigation and that she now denies that the resident told her of the incident a year prior, another employee, Amy Thayer, reported that the resident had in fact made the allegation to her a year earlier.

When asked on deposition why he thought ASI's investigation was incomplete and biased, Blackstone could only surmise that "they could have somehow just looked at [him] in a different light," and that the investigation was conducted in a way that made him believe they thought "all black people were alike and that the allegations didn't really merit a thorough investigation or even an impartial investigation." This impression was based on the fact that Blackstone supposedly did not learn about the criminal charge against him until he applied for a job after his termination and because he believed that ASI had contacted various agencies about the allegations only *after* he filed his Charge of Discrimination with the MCHR. Blackstone opined that ASI "conducted this investigation, if there was an investigation, with one thing in mind and that was to terminate [him]."

The undisputable evidence, however, undermines this conjecture. ASI contacted the Calvert County Sheriff's Office, the Office of Health Care Quality, and the Calvert County Office on Aging and reported the complaint on June 5, 2003, eighteen days *before* Blackstone filed his complaint with MCHR**.** In addition, Detective Hollinger unequivocally states that ASI had no input into his decision to press charges, which ASI may not even have known about. The record is devoid of evidence to support

8

Blackstone's assertion that ASI's investigation was conducted with the sole purpose of terminating him with discriminatory animus. His own speculation of disparate treatment is insufficient to withstand a motion for summary judgment. *See Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (party opposing summary judgment cannot create a genuine issue of material fact through speculation or the building of one inference upon another).

Though a member of a protected class, Blackstone has not demonstrated that any employee outside his protected class engaged in conduct comparable in seriousness to what he was alleged to have done. *See Cook*, 988 F.2d at 511. Nor has he produced evidence indicating that any similarly-situated white employee was treated more favorably in the investigation of similarly severe allegations or with respect to the discipline that was dispensed.[3] Nursing Director Murray states that in the five years she worked at ASI, no employee–other than Blackstone–was ever accused of intentionally physically assaulting a resident.

The Court GRANTS ASI's Motion for Summary Judgment as to the disparate treatment claim.

---

[3] Blackstone points to a white employee who was terminated, then brought back. Murray believes that Blackstone may be referring to Jennifer Zieman, who was terminated because of an attendance problem and who then protested the termination, claiming it was the result of a failure in communication. Blackstone also believes Ann Swales was treated more favorably than he. Swales was terminated for having inappropriate verbal communication with a resident. Finally, Blackstone claims that an "Evonna Coleman" was accused of mistreating a patient. While no one with that exact name has worked at ASI, ASI suggests that an employee named Jevannah Coleman was terminated for falsifying time records. Assuming all these individuals were outside Blackstone's protected class, none of the misconduct they were alleged to have engaged in approaches in seriousness that with which Blackstone was charged.

# V.

## Wrongful Discharge

Blackstone next asserts a claim for wrongful discharge in violation of 42 U.S.C. § 1981 and Title VII, alleging that ASI terminated him due to his race and color. ASI argues that Blackstone has failed to establish a prima facie case of discriminatory discharge, and, even if he has, that the corroborated report of an assault on an elderly resident was a legitimate, non-discriminatory reason for terminating him.

 Section 1981 prohibits discrimination based on race in the making and enforcement of private contracts. 42 U.S.C. § 1981(a). It proscribes only purposeful discrimination.  *See Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391 (1982). Title VII makes it "an unlawful employment practice for an employer ... to discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "[T]he framework of proof for disparate treatment claims is the same for actions brought under Title VII or § 1981, or both statutes." *Bryant v. Aiken Reg. Med. Ctrs. Inc.*, 333 F.3d 536, 545 n.3 (4th Cir. 2003).

A plaintiff can prove discriminatory intent in employment practice either by producing direct evidence of discriminatory animus or through the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Since Blackstone cites no direct evidence of discriminatory intent, he must rely on the *McDonnell Douglas* framework. He must therefore first establish a prima facie case of discrimination, at which point the burden of production will shift to the defendant employer to establish a legitimate, nondiscriminatory explanation for the employment action. *Id*. If ASI is able to produce such a legitimate nondiscriminatory reason, the burden then will shift back

10

to Blackstone to show by a preponderance of evidence that the proffered reason was a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To establish a prima facie case of discriminatory discharge, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered from an adverse employment action; (3) at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Blackstone has failed to establish a prima facie case of discriminatory discharge.[4] As an African American, he is a member of a protected class and he unquestionably suffered an adverse employment action when he was terminated from his position. However, beyond simply asserting that he never missed any days of work, never had any problems with his co-workers, and declaring that nothing in his employment record suggested he would mistreat an elderly person, he has not provided any objective evidence that he was performing at a level that met his employer's legitimate expectations.[5]  ASI emphasizes that it found Blackstone's job performance less than satisfactory precisely because of the two allegations of resident abuse, the second of which was brought by a lucid resident and confirmed by her equally competent and reliable sister. Finally, Blackstone falters with respect to the fourth element of

---

[4] Although *pro se* pleadings are held to less stringent standards than pleadings drafted by attorneys, *see White v. White*, 886 F.2d 721, 722-723 (4th Cir. 1989), construction of such pleadings is not without limits. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

[5] As noted earlier, however, documents obtained during discovery in this case in fact indicate that Blackstone had been accused of improperly treating elderly persons in prior employment positions, allegations that Blackstone never chose to contest. ASI does not claim that it relied on this information in making its decision to terminate him.

a prima facie case because following his termination, Belinda Edwards, an African American woman, was hired to replace him.

In any case, assuming arguendo that Blackstone could establish a prima facie case, ASI has provided a legitimate, non-discriminatory reason for terminating him. *McDonnell Douglas,* 411 U.S. at 802. An allegation of patient abuse is a legitimate, non-discriminatory reason for an adverse employment action. *See Billups v. Methodist Hospital of Chicago*, 922 F.2d 1300, 1303 (7th Cir. 1991). Blackstone can point to no evidence demonstrating that ASI's explanation for his termination was a pretext for illegal discrimination. To the contrary, one of the people involved in the decision-making process, ASI Vice President Waack, was not even aware of Blackstone's race when deciding to terminate him.

ASI is entitled to summary judgment on the wrongful discharge claim.

## VI.

## Malicious Prosecution

Blackstone's claim for malicious prosecution hinges on his belief that ASI improperly caused the Calvert County Sheriff's Office to arrest and charge him with second degree assault. Under Maryland law, to establish a claim for malicious prosecution, a plaintiff must establish that (1) a criminal proceeding was instituted or continued by the defendant against him; (2) it terminated in his favor; (3) there was an absence of probable cause for the proceeding; and (4) the defendant acted with malice or for a purpose other than bringing the plaintiff to justice. *S. Mgmt Corp. v. Taha*, 836 A.2d 627, 637 (Md., 2003). A plaintiff must produce evidence satisfying all four elements to succeed. *Nasim v. Tandy Corp.*, 726 F. Supp 1021, 1023 n.4 (D. Md. 1989), *aff'd* 902 F.2d 1566 (4th Cir. 1990).

12

Under Maryland law, an institution such as ASI has an obligation to report any allegation of abuse to an appropriate law enforcement agency, the State Department of Health and Mental Hygiene or the Department of Aging. Md. Code Ann., Health-Gen'l, § 19-347(b) (2000).[6] In addition, regulations adopted by the Maryland Department of Health and Mental Hygiene require a licensee or employee of an assisted living program to report suspected abuse. COMAR 10.07.14.27.C.[7] Individuals who fail to report suspected abuse within three days are subject to a civil fine. Md. Code Ann., Health-Gen'l, § 19-347(c).[8] Accordingly, ASI had no discretion as to whether to report the resident's allegation of assault to the Calvert County Sheriff's Office. To the extent that Blackstone's malicious prosecution claim turns on ASI reporting the alleged abuse or participating in an investigation of that abuse, the claim is clearly barred. *See* Md. Code Ann., Health-Gen'l, § 19-347(b) (2000). *See also* Md. Code Ann., Cts. & Jud. Proc., § 5-630 (2002).

Immunity aside, Blackstone's claim is meritless. He simply assumes, without offering the least evidence, that ASI must have influenced the decision to press charges against him because Detective Hollinger supposedly submitted his application for statement of charges to the District Court

---

[6] Section 19-347(b) provides: "(1) A person who believes that a resident of a related institution has been abused shall report promptly the alleged abuse to an appropriate law enforcement agency, the Secretary, or the Department of Aging; (2) A report: (i) May be oral or written; and (ii) Shall contain as much information as the reporter is able to provide."

[7] COMAR 10.07.14.27.C states, "(1) A licensee or employee of an assisted living program who believes that a resident has been subjected to abuse, neglect, or exploitation shall report the alleged abuse, neglect or exploitation within 24 hours to: (a) the appropriate local department of social services, adult protective services office; and (b) One or more of the following: (i) A local law enforcement agency, (ii) The Licensing and Certification Administration of the Department, (iii) A representative of the Long-Term Care Ombudsman Program in the Department of Aging or local area agency on aging."

[8] Section 19-347(c) states, "Any employee of a related institution who is required to report alleged abuse under subsection (b) of this section, and who fails to report the alleged abuse within 3 days after learning of the alleged abuse, is liable for a civil penalty of not more than $1000."

Commissioner's Office a few days after the notice of charge of discrimination was mailed by MCHR to ASI. This assumption is conclusively put to rest by Hollinger's affirmation that, after receiving the initial report from ASI, he was given no further assistance or input from ASI in deciding whether to proceed.

Nor has Blackstone demonstrated that ASI lacked probable cause to report the allegations to the Calvert County Sheriff's Office. Under Maryland law, probable cause exists when there is "a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty." *Alvarez v. Montgomery County*, 147 F.3d 354, 360 (4th Cir. 1998). Probable cause does not require that the evidence be sufficient to convict. *Id*. In this case, ASI had received an allegation of abuse from a resident that was confirmed in neutral fashion by her sister, where both women were found to be mentally competent and physically capable of observation. In addition, Detective Hollinger, who investigated the matter, determined for himself that there was sufficient evidence to file an application for charges with the Commissioner's Office in Calvert County. The Commissioner's Office decided to issue a criminal summons against Blackstone, finding probable cause to do so. Even Blackstone, on deposition, admitted that ASI had probable cause to report the resident's allegation of abuse.

Finally, Blackstone has in no way shown that ASI acted with "malice." Malice in the  context of malicious prosecution is defined as "a wrongful or improper motive in initiating legal proceedings against the plaintiff." *Alvarez*, 147 F.3d at 360. Based on all the considerations previously discussed, ASI could fairly conclude that an assault on a resident had actually occurred.

Whether based on immunity from prosecution or on the merits, Blackstone's claim of malicious prosecution goes out on summary judgment.

14

# VII.

## Defamation

Blackstone also contends that ASI published a defamatory communication when it reported the resident's allegations to the Calvert County Sheriff's Office, Maryland Board of Nursing, Calvert County Office of Aging and Office of Health Care Quality. Under Maryland law, to establish defamation when the plaintiff is not a public figure, the plaintiff must prove that (1) the defendant made a defamatory communication to a third person; (2) the statement was false; (3) the defendant was at fault in communicating the statement; and (4) the plaintiff suffered harm. *Murray v. United Food and Commercial Workers Int'l Union,* 289 F.3d 297, 305 (4th Cir. 2002). Again, Blackstone cannot prevail.

Anyone who makes a report required by § 19-347 of the Health General Article of the Maryland Code is immune from suit regardless of the legal theory asserted against him. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-630 (2002)[9]; COMAR § 10.07.14.27.F. Immunity is also conferred upon an individual making the required report to the State Board of Nursing. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-709(b)[10]. If that were not enough, the common law confers a conditional privilege for statements whose publication "advances social policies of greater importance than the vindication of a

---

[9] Section 5-631 states, "(a) A person who acts in good faith is not civilly liable for: (1) Making a report under § 19-347 of the Health-General Article; (2) Participating in an investigation arising out of a report under § 19-347 of the Health-General Article; (3) Participating in a judicial proceeding arising out of a report under § 19-347 of the Health-General Article; or (4) Participating in transferring, suspending or terminating the employment of any individual who is believed to have abused or aided in abusing a resident under § 19-347 of the Health-General Article."

[10] "(b) An individual who acts without malice is not civilly liable for making a report as required by § 8-505 of the Health Occupations Article."

plaintiff's reputational interest." *Ransom v. Baltimore County*, 111 F. Supp.2d 704, 711 (D. Md. 2000) (quoting *Marchesi v. Franchino*, 283 Md. 131, 135, 387 A.2d 1129, 1131 (1978). One of those "social policies of greater importance" is most assuredly protecting elderly residents in retirement facilities from abuse. Therefore, even if the allegations concerning Blackstone were later determined to be unsubstantiated, ASI cannot be held liable for reporting the allegations to the appropriate agencies.

Again, ASI was required by law to report any allegation of resident abuse that it believed to be true. *See* Md. Code Ann., Health-Gen'l, §19-347(b); COMAR 10.07.14.27.C. In addition, Maryland requires licensed nursing personnel who know of actions or conditions that may violate practice standards or law to report those actions or conditions to the State Board of Nursing. *See* Md. Ann. Code, Health Occupations, § 8-505(a) (2000).[11] Actions or conditions falling within this statute include practicing as a nursing assistant in a manner that fails to meet generally accepted standards for the practice of a nursing assistant; and physically, verbally, or psychologically abusing, neglecting, or otherwise harming such a person under the applicant or certificate holder's care. *See* Md. Ann. Code, Health Occupations, § 8-6A-10(a) (2000). A certified medicine aide such as Blackstone is a certified nursing assistant. *See* Md. Code Ann., Health Occupations, § 8-6A-01(e) & (f) (2000). As a result, ASI had a legal obligation to report allegations of abuse by an elderly resident to the aforementioned agencies.

ASI is entitled to summary judgment on the defamation count.

---

[11] Section 8-505 of the Health Occupations Art., Md. Ann. Code, provides: "(1) If a nursing administrator, registered nurse, or licensed practical nurse knows of an action or condition that might be grounds for action under § 8-316 or Subtitle 6A of this title, the nursing administrator, registered nurse, or licensed practical nurse shall report the action or condition to the Board."

**VIII.**

**Intentional Interference with Prospective Advantage**

Finally, Blackstone claims that ASI intentionally and willfully reported unsubstantiated allegations about his alleged abuse to the various state agencies, knowing that the reports would cause damage to his career in the nursing field, and that in fact the reports occasioned economic and non-economic damages. To succeed on a claim for intentional interference with prospective advantage, a plaintiff must prove (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in his lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; with (4) actual damage and loss resulting. *Mates v. N. Am. Vaccine, Inc.,* 53 F. Supp.2d 814, 828 (D. Md. 1999).

Again, immunity blocks Blackstone's path and again Blackstone's claim fails on the merits. He cannot establish the first three elements of the tort: (1) that the reports to the agencies were "intentional or willful," given that the reports were legally mandated and the allegations were confirmed by the resident's sister; (2) that the reports to the agencies were "calculated to cause damage" or (3) that they were "done with the unlawful purpose to cause such damage and loss without justifiable cause." Indeed, it is likely that Blackstone's difficulty in finding employment in nursing facilities after being terminated by ASI certainly has had as much to do with his previous employment record as it has had with his employment at ASI.

Blackstone has no cause of action for intentional interference with prospective advantage.

17

## IX.

For the foregoing reasons, the Court GRANTS ASI's Motion for Summary Judgment and Final

Judgment will be ENTERED in favor of ASI and against Blackstone. A Separate Order will issue.


July 15, 2005                                                   /s/
_____
                                                   PETER J. MESSITTE
                                        UNITED STATES DISTRICT JUDGE